UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ELENORA E. RAIT and AMBER H. RUPERT,

          Plaintiffs,

    v.                                                          Case No. 05-C-1270

OSHKOSH ARCHITECTURAL DOOR CO. a/k/a
OSHKOSH DOOR CO., et al.,

          Defendants.

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

       Plaintiffs Elenora E. Rait and Amber H. Rupert brought suit against their former employer, defendant Oshkosh Door Company ("ODC"), and ODC's insurer, alleging that they were subject to a hostile work environment and then suffered retaliation and constructive discharge after lodging discrimination complaints, all in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq*. The case is now before the court on ODC's motion for summary judgment. ODC argues there is insufficient evidence of a hostile work environment, and that the retaliation and constructive discharge claims fail as a matter of law. ODC also argues that even if the evidence of a hostile work environment was sufficient to get to a jury, plaintiffs' failure to take advantage of its anti-harassment policy precludes liability on its part. Based on the analysis that follows, the court finds ODC's argument convincing and therefore grants summary judgment in its favor.

**BACKGROUND**

ODC, which is located in Oshkosh, Wisconsin, manufactures specialty and custom wood doors. Plaintiffs Elenora E. Rait and Amber H. Rupert, at all times material hereto, were employees of ODC. Rait began working permanently at ODC on April 22, 2002,[1] while Rupert began her employment on March 3, 2002. Both plaintiffs worked as inspectors in the veneer department, and when both were on duty, would work together as a team.

During their employment at ODC, both plaintiffs worked with Mark Bidwell, who was employed as a "veneer coordinator/material handler." (DPFOF ¶ 12.) Bidwell's main job responsibilities were to drive a forklift and supply the veneer lay-up teams with materials. (DPFOF ¶ 13.) His job description gave him no supervisory authority over anyone at ODC (DPFOF ¶ 14), but plaintiffs allege that Bidwell, at least at times, "acted in the mode of management" insofar as he would assume the job duties of Greg King, the veneer department's "lead person," when King was absent. (Resp. Br. at 2.) The "lead" is to handle on-the-floor problems, work assignments, and scheduling so as to keep the work product moving; it is not a titled management position, however, as the lead person has no authority to fire, hire, promote, discipline, transfer, or reassign employees. (DPFOF ¶¶ 29, 30.)

Plaintiffs' hostile workplace claim rests primarily on their allegations of misconduct by Bidwell. Plaintiffs allege, for example, that it was "common knowledge" that Bidwell would expose himself to a 58-year-old female co-worker, and that he had exposed himself to another

---

[1] Rait began working at ODC through a temp agency placement, which began in January of 2002. (Rait Compl. at 3.)

female employee prior to plaintiffs' employment. (Rait Compl. at 5.)[2] ODC notes that these complaints were never voiced to management, nor was ODC management aware of these incidents. (DPFOF ¶ 16.) But more importantly, such "common knowledge" or, to be more precise, workplace rumor, constitutes inadmissible hearsay that is "unusable in summary judgment proceedings without a showing not attempted here that it could readily be replaced at trial by admissible evidence." *Minor v. Ivy Tech State College*, 174 F.3d 855, 856-57 (7th Cir. 1999). I therefore decline to consider such evidence here.

Plaintiffs' primary complaint appears to be Bidwell's inappropriate but apparently consensual behavior with another female employee. The incidents which are catalogued in their respective complaints and repeated in their brief in opposition to ODC's motion include the following:

1. January 30, 2003 – Bidwell sat on another woman's lap.
2. January 31, 2003 – A female co-worker was on a ladder holding onto Bidwell's hips and Bidwell was holding onto her hips.
3. February 8, 2003 – A female worker bent over and Bidwell put his foot between her legs and against her genital area.
4. February 27, 2003 – Bidwell put his hands on a female worker's hips and "spooned" her.
5. March 2, 2003, - Bidwell was sitting facing the other female worker and she put her feet on his legs.
6. March 6, 2003 – Bidwell pulled a female worker towards him with her back to him.
7. March 5, 2003 – Bidwell was standing with a female worker, back-to-back and Bidwell touched the female worker's backside.
8. March 6, 2003 – A female worker was sitting on the ladder from underneath Bidwell and he
9. March 7, 2003 – Bidwell grabbed a female worker's backside.
10. April 8, 2003 – Bidwell was standing behind a female worker and slid his hand up her back and under her shirt.
11. May 11, 2003 – Bidwell took something out of a female worker's mouth with his mouth.

---

[2] Given that plaintiffs' complaints mirror one another almost exactly, incidents of Bidwell's alleged misconduct will generally be cited only as they appear in Rait's complaint.

3

(Rait Compl. ¶ 10 C; Rupert Compl. ¶ 9 C; Br. in Opp. at 3.) Although plaintiffs do not identify her in their complaints, the female with whom Bidwell engaged in this behavior was co-worker Pam Wesner, who clearly consented to and reciprocated Bidwell's advances. (Rait Compl. at 5-6.) In an April 11, 2003, performance review with Plant Foreman Chris Applebee, Rait complained that Bidwell would fondle Wesner at work. (DPFOF ¶ 18.) Sometime during the following week, Rupert submitted to management a hand-written note detailing ten separate incidents of inappropriate touching between Bidwell and Wesner that mirror those alleged in plaintiffs' complaints. (DPFOF ¶ 20; Rait Compl. at 6.)

Plaintiffs also allege some of Bidwell's behavior was directed at them. Bidwell allegedly once told plaintiffs that he wanted to "screw a woman while her head was in a press because she would be squirming." (Rait Compl. at 7.) On another occasion, he allegedly told plaintiffs and other female workers that he had masturbated at his home and that his dog had licked up the ejaculate. (Rait Compl. at 8.) Bidwell also allegedly spoke of his sexual fantasies and dreams on a regular basis, although it is unclear whether he directed this speech to plaintiffs or whether they merely overheard it. (Rait Compl. at 7.) On another occasion, Bidwell allegedly poised a tow motor load over the area where plaintiffs were working and commented, "Don't worry, it won't kill you, but if something happened[,] I could take advantage of your dead bodies." (Rait Compl. at 7.) On October 7, 2004, Bidwell allegedly kicked Rait in the buttocks while she was talking to lead person Greg King, although King did not see it. (Rait Compl. at 8.) In October of 2004, Bidwell allegedly told Rupert he had left a photocopy of his penis in a desk drawer, and that she should look at it. (Rupert Compl. at 7). Plaintiffs claim Bidwell showed them a deck of playing cards with depictions of women on the backsides, and then told them he was going into the bathroom with the cards to "stay awhile." (Rait Aff. at 3; Rupert Compl. at 7.) Finally, on one occasion in October

4

of 2004, Rait suspected Bidwell was spying on her through a one-inch peephole in the wall separating the men's and women's bathrooms. (Rait Compl. at 8.) Both plaintiffs allege Bidwell would enter the men's bathroom when he saw one of the plaintiffs entering the adjoining women's bathroom, and would remain there for some time after plaintiff exited. (Rait Compl. at 7; Rupert Compl. at 6-7.)

Plaintiffs have also submitted copies of allegedly obscene graphics and written material that they contend were displayed, with management's acquiescence, in the finishing area of ODC. (Rait Compl. Ex. C.) This area is allegedly one that employees needed to frequent. (Rait Compl. at 9.) The graphics include a person in a gorilla suit with his hands on the back of a fully clothed man who is bent forward, a cartoon of a man whose buttocks are showing through his pants, and an office party photo of Bidwell, fully clothed, with a party mask covering his groin area.[3] (Rait Compl. Ex. C.) The written material is formatted in the fashion of a business card, and consists of short messages such as "Kiss my ass," "Can I squeeze your tits," "You are cordially invited to sit on my face," and "Sex Instructor: First Lesson Free." (Rait Compl. Ex. C.)

Plaintiffs contend that the items remained posted even after they complained about them in their April 2003 work review meetings with management.[4] (Resp. Br. at 7). As to the written material, ODC claims (1) it was not kept in any work area; (2) it includes a handwritten statement

---

[3] Plaintiffs also allege there is an image of a man urinating on a bathroom floor, but the court was unable to discern this image in plaintiffs' exhibits, perhaps owing to the small size and poor quality of the images. (*See* Rait Compl. Ex. C.)

[4] Whole sections of Rait's and Rupert's complaints are identical in language, at times with seeming inattention to the need to adjust the language to reflect who the plaintiff is. It is thus uncertain whether Rait and Rupert *each* complained to management during an April 2003 work review meeting, as a literal reading of the complaints suggests, or whether only Rait complained to management at that time. (*See* Rait Compl. at 9; Rupert Compl. at 9.) Defendants acknowledge only that Rait complained to management in April of 2003. (Br. in Supp. of Mot. for Summ. J. at 3.)

5

signed by Rait and Rupert that indicates the items were never posted anywhere; and (3) it was never submitted in the original investigation by the Equal Rights Division (ERD) of Wisconsin's Department of Workforce Development. (DPFOF ¶ 53.) Regarding the graphics, ODC notes that some were removed, plaintiffs never complained about others (to ODC or in the ERD investigation), and the rest do not represent anything creating a hostile work environment. (DPFOF ¶¶ 54-56.) ODC also notes that neither plaintiff alleges she complained about any postings while she worked at ODC until this litigation commenced.

ODC acknowledges that Rait complained about Bidwell's behavior in her April 2003 work review meeting with Plant Foreman Chris Applebee, and that management received Rupert's handwritten complaint at roughly the same time. (DPFOF ¶¶ 18-20.) ODC promptly investigated, and on April 17, 2003, both Bidwell and Wesner were warned by management about participating in any activities that could be construed as inappropriate touching, and the warning was noted in each employee's personnel file. (DPFOF ¶ 21.)

Rait complained to Distribution Services Manager Rick Smit on October 28, 2004, that Bidwell's inappropriate comments of a sexual nature to other employees continued, and she also told him of the bathroom peephole incident. (DPFOF ¶ 22.) ODC management investigated the allegations, discussed them with Bidwell, and then fired Bidwell on account of his admissions that he made inappropriate sexual comments at work, although he denied peeping into the women's bathroom. (DPFOF ¶¶ 25-27.) ODC also promptly repaired the bathroom. (DPFOF ¶ 24.)

Plaintiffs assert they complained to another ODC manager and to a *de facto* manager, and that nothing came of these additional complaints. Rait alleges that in August 2004 she complained to then-General Manager Bob Sellers of the inappropriate behavior between Bidwell and Wesner

6

and of Wesner's hostility to Rupert. (Rait Compl. at 9; Rait Aff. ¶ 5.) Rait alleges that the ODC human resources department told her on November 16, 2004, "that the complaint had been shredded." (Rait Compl. at 9.) According to ODC, Rait's assertion that she complained to Sellers is not credible. ODC points to Rait's January 26, 2005, memo to the ERD,[5] wherein Rait admitted that her conversation with Sellers centered on insurance coverage issues and on her unhappiness with how Human Resources Director Laurie Zelm was treating her. (DPFOF ¶ 34.)

There is evidence indicating plaintiffs complained of Bidwell's and Wesner's behavior to lead person Greg King, who apparently made notes after each complaint. Upon examining a file in King's desk marked "personal," plaintiffs found notes, allegedly written by King, that briefly describe four incidents involving Bidwell and Wesner that occurred between May and September of 2004, as well as the bathroom peeping incident. (Resp. Br., Ex. 24.) In the wake of Rait's October 2004 complaint to management, King was removed from his lead position after he admitted he was aware of some incidents of flirtation and touching between Bidwell and Wesner and had not reported them because he believed they were not serious violations. (DPFOF ¶ 28.)

Plaintiffs allege they made additional complaints to Plant Foreman Applebee and Human Resources Director Laurie Zelm. Plaintiffs allege they complained "on a regular basis" to "either Greg [K]ing or Chris Applebee" between April 2003 and April 2004 regarding the inappropriate behavior of Bidwell and Wesner, but that they were shrugged off and received no response. (Rait Aff. ¶ 12; Rupert aff. ¶¶ 11, 13.) Rait also alleges that on October 28, 2004, she advised Zelm of her discomfort with Bidwell's behavior. (Rait Aff.; Resp. Br., Ex. 7 ¶ 14.)

---

[5] As ODC points out, both plaintiffs expressly adopted assertions in memos to the ERD during their deposition testimony. (*See* Rait Dep. at 23-24; Rupert Dep. at 23-24.)

7

Following their October 2004 complaint to management (which led to Bidwell's termination and King's demotion), plaintiffs allege that their co-workers began to give them the "cold shoulder" and that they were assigned more challenging tasks and forced to work alone. (Rait Compl. at 10; Rupert Compl. at 9-10.) ODC responds that the "cold shoulder" charge was in essence a personality conflict between plaintiffs and Wesner, and that when ODC learned of the issue in December 2004, ODC management promptly held meetings with plaintiffs and Wesner separately and with the entire veneer department to attempt to remedy the situation. (DPFOF ¶¶ 35-37.) Wesner was instructed to avoid discussing Bidwell's termination and to avoid any further disputes with plaintiffs. (DPFOF ¶ 38.) At the department meeting, ODC emphasized that all employees needed to work together, be cordial to one another, and to comply with the rules. (DPFOF ¶ 36.) ODC points out that plaintiffs never complained to management about the alleged changes in their work assignments (DPFOF ¶¶ 40-42), and that, furthermore, their positions in the veneer department can be done by one person though they are generally easier to do with a partner. (DPFOF ¶ 48.) It is ODC's policy not to pull someone from another department in the event of an unexpected vacancy, as this would merely create a shortage in the "loaning" department. (DPFOF ¶ 46.)

Claiming she was suffering emotionally from the alleged retaliation (Rait Aff. at 10), Rait quit her job on January 12, 2005; thereafter, Rupert, who had customarily worked with Rait, worked alone. (DPFOF ¶¶ 47-51.) On account of slow work orders at the time, ODC did not hire anyone to replace Rait. (DPFOF ¶ 50-51.) By the end of the month, Rupert failed to return to work, also for alleged emotional health reasons, with her last day of employment being January 31, 2005. (DPFOF ¶ 44.)

In November 2004 and March 2005, Plaintiffs filed complaints with the Equal Rights Division (ERD) of Wisconsin's Department of Workforce Development, alleging claims of a hostile

8

work environment based on sex (in the November 2004 complaint), as well as retaliation and constructive discharge (in the March 2005 complaint). The ERD cross-filed the complaints with the Equal Employment Opportunity Commission (EEOC), which issued each plaintiff a right-to-sue letter on the discrimination claims on October 6, 2005, but which failed to find probable cause for plaintiffs' retaliation and constructive discharge claims. Plaintiffs filed separate suits in this court, which consolidated the cases. Presently before me is defendant ODC's motion for summary judgment.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a *genuine* issue of *material* fact for the case to survive. *Id.* at 247-48.

"Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. A

9

"genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ANALYSIS

**I. Hostile Work Environment**

Title VII prohibits "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Discrimination may be direct and specific, or it may take the form of a work environment hostile to the plaintiff. To succeed on a hostile work environment claim, a plaintiff must show the following:

> (1) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the harassment was based on her sex; (3) the sexual harassment had the effect of unreasonably interfering with her work performance in creating an intimidating, hostile, or offensive working environment that seriously affected her psychological well-being; and (4) a basis for employer liability exists.

*Phelan v. Cook County,* 463 F.3d 773, 783 (7th Cir. 2006).

The dispute in most hostile work environment cases is whether the complained-of conduct and speech were merely harmless "locker room"-style horseplay and banter, or whether they crossed the line into objective hostility. To succeed on a Title VII hostile work environment claim based on sex discrimination, the plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] . . . because

of . . . sex.'" *Oncale v. Sundowner Offshore Servs., Inc.* 523 U.S. 75, 81 (1998). Title VII cannot be expanded into a "a general civility code," and it requires neither androgyny nor asexuality in the workplace. *Id*. "The work environment cannot be described as 'hostile' for purposes of Title VII unless a reasonable person would find it offensive and the plaintiff actually perceived it as such." *Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 807 (7th Cir. 2000) (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998)). The question, then, is whether the allegedly improper conduct was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation and citation omitted). In evaluating the severity and pervasiveness of the conduct, a court looks to "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Russell v. Bd. of Trustees of Univ. of Ill. at Chicago*, 243 F.3d 336, 343 (7th Cir. 2001) (internal citation omitted).

Analysis of a hostile work environment claim typically involves subtle gradations and fact-specific normative evaluations, but the Seventh Circuit has provided some guidance by at least marking out the ends of the continuum. "On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." *Patton v. Keystone RV Co.,* 455 F.3d 812, 816 (7th Cir. 2006) (quoting *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir. 1995) (citations omitted)).

With these considerations in mind, I turn to the substance of the behavior in question and, because the matter is before me on a motion for summary judgment, I will assume the plaintiff's

11

version of events is true.[6] The allegedly improper conduct can be placed in three general categories: (1) Bidwell's conduct and speech toward Wesner; (2) Bidwell's conduct and speech directed at plaintiffs; and (3) the items posted in the finishing area.

I first note that Bidwell's behavior toward Wesner was apparently consensual and thus does not constitute sexual harassment. It may be distasteful for two employees to openly engage in the kind of flirting or consensual sexual activity plaintiffs allege they observed in the workplace, but it is not behavior that constitutes a hostile work environment. *See Kriescher v. Fox Hills Golf Resort & Convention Ctr.*, 384 F.3d 912, 915 (7th Cir. 2004). Even if Wesner had objected to Bidwell's conduct, it would still constitute only weak evidence that plaintiffs were subjected to a hostile work environment since none of it was directed at them. As the Seventh Circuit has observed, the impact of such "second-hand harassment" is not as great as conduct directed at the plaintiff. *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1144 (7th Cir. 1997). Here, however, the evidence is that Wesner consented to the behavior and in fact reciprocated it. There is no suggestion that it was directed at plaintiffs, or that they found it threatening. Instead, the evidence suggests that they found it distasteful. This is not sexual harassment.

As to the remaining conduct cited by plaintiffs, I find it insufficiently pervasive or severe to support a claim for a hostile work environment. With respect to the posted items and Bidwell's conduct directed at female employees other than plaintiffs, plaintiffs have not even made the required showing that the complained-of conduct was directed at them on the basis of their sex. *See Phelan,* 463 F.3d at 783. Bidwell's behavior and comments—whether directed at plaintiffs or

---

[6] Some of the events may fall outside of the statute of limitations period, but are generally consistent with the events recounted within that period.

12

not—were clearly boorish and immature, but Title VII does not guarantee an employee the right to be free of boorish or immature co-workers. Similarly, the posted items reflect sophomoric humor, but they fail to give evidence of a "severe or pervasive" hostile work environment. The complained-of conduct and speech seem very much like the coarse, "locker room"-style behavior and banter that mark out one end of the above-mentioned continuum. While behavior and banter at this end of the continuum may be unpleasant to endure and even subjectively offensive, that is not enough to support a hostile work environment claim. Rather, a work environment cannot be considered hostile unless it is *both* subjectively and objectively offensive, *Faragher*, 524 U.S. at 787, and plaintiffs have failed to demonstrate the latter.

A brief survey of Seventh Circuit cases wherein no actionable sexual harassment was found would show that plaintiffs allegations, although they do describe objectionable conduct, fall short of creating an objectively hostile work environment. *E.g., McPherson v. City of Waukegan*, 379 F.3d 430, 439 (7th Cir. 2004) (holding that supervisor's alleged inquiries about what color bra employee was wearing, use of suggestive tone of voice when asking her whether he could "make a house call" when she called in sick, and pulling back her tank top to see her bra on one occasion, if proven, did not constitute severe or pervasive conduct necessary to create objectively hostile work environment); *Hilt-Dyson v. City Of Chicago*, 282 F.3d 456, 463-64 (7th Cir. 2002) (holding that plaintiff's allegations that supervisor rubbed her back, squeezed her shoulder and stared at her chest during a uniform inspection while telling her to raise her arms and open her blazer were isolated incidents that, even when taken together, did not create a sufficient inference of a hostile work environment); *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (holding that plaintiff's complaints of eight gender-related comments during course of her employment, including

13

that "the only valuable thing to a woman is that she has breasts and a vagina," insufficient to demonstrate hostile work environment); *Adusumilli v. City of Chicago*, 164 F.3d 353, 361-62 (7th Cir. 1998) (finding plaintiff's complaints of teasing, ambiguous comments about bananas, rubber bands and low-neck tops, staring and attempts to make eye contact and four isolated incidents where a co-worker briefly touched her arm, fingers or buttocks did not constitute sexual harassment). *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430-31 (7th Cir. 1995) (holding that plaintiff's supervisor had not engaged in actionable sexual harassment even though, over a seven-month period, he had (1) called the plaintiff a "pretty girl," (2) made grunting sounds when the plaintiff wore a leather skirt, (3) said to the plaintiff that his office was not hot "until you walked in here," (4) stated that a public address announcement asking for everyone's attention meant that "all pretty girls [should] run around naked," and (5) alluded to his wife's absence from town and his loneliness, stating that he had only his pillow for company while making an obscene gesture). Plaintiffs' allegations fall in roughly the same area of the continuum as does the conduct described in these cases, especially in light of the fact that the majority of the complained-of conduct was not even directed at plaintiffs.

The "cold shoulder" treatment plaintiffs allegedly received from co-workers after Bidwell was fired similarly fails to support a hostile work environment claim. Personality conflicts at work that generate antipathy and mere snubbing by co-workers and even supervisors are not actionable under Title VII. *See Burlington Northern & Sante Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2415 (2006) (citing B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed. 1996)). To repeat the Supreme Court's well-known phrasing, "Title VII . . . does not set forth 'a general civility code for the American workplace.'" *Burlington Northern*, 126 S. Ct. at 2415 (quoting

14

*Oncale*, 523 U.S. at 80 (1998)). Furthermore, the mere fact that an employee received the "cold shoulder" *after* lodging a discrimination complaint does not, by itself, render such behavior actionable under Title VII. "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington Northern*, 126 S. Ct. at 2415.

## II. Constructive Discharge

Establishing constructive discharge is a two-step process. First, a plaintiff needs to show that her working conditions were so intolerable that a reasonable person would have been compelled to resign. *Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 877 (7th Cir. 1999) (internal quotation and citation omitted). Under this standard, the working conditions undergirding a claim of constructive discharge must be even more egregious than those that would support a hostile work environment claim. *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000). Second, the conditions must be intolerable because of the unlawful discrimination. *Simpson*, 196 F.3d at 877 (internal quotation and citation omitted). Here, there is no need to go beyond the first step of the analysis. Because plaintiffs have failed to show a hostile work environment, their claims of constructive discharge, with its even higher standard of egregiousness, fail as a matter of law.

## III. Retaliation

To demonstrate a *prima facie* case of retaliation under Title VII, a plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *See Sweeney v. West*,

15

149 F.3d 550, 555 (7th Cir. 1998). As I have already determined that plaintiffs' work environment was not objectively hostile, a hostile work environment cannot satisfy the second element—that is, a hostile work environment cannot here constitute the adverse employment action.

Plaintiffs point to other facts that allegedly constitute an adverse employment action, however. Plaintiffs allege that after they complained to management in October of 2004, fellow employees, apparently upset that plaintiffs had instigated Bidwell's firing, began to act differently and more formally toward them— in effect, giving them the "cold shoulder." They also allege that ODC retaliated against them by giving them more challenging work and requiring them to work alone. Rait's frustration seems to have been exacerbated by her perception that while she worked alone, certain co-workers were given lighter duties, such as sweeping floors. (Rait Aff. at 9.) There is also an implication that ODC management approved of the co-workers' cool treatment toward plaintiffs as a means to get back at them for filing the ERD complaint in November of 2004.

These allegations do not constitute an adverse employment action because none of them is a materially adverse change in the terms and conditions of employment, nor is there any evidence that ODC approved of the alleged "cold shoulder" treatment. Neither plaintiff specifies what made her work more challenging other than the fact that she had to work alone. Rait states only that she had to do one job involving plastic sheets rather than wood-product veneer sheets, and like her veneer work, the job was "usually" assigned to a pair rather than an individual. (Rait Aff. at 9.) As to working alone, both plaintiffs admit that their work could be done satisfactorily by one person—and in fact each had done the veneer work alone—although it was more common to work with a partner. Rupert's working alone during this time seems largely if not exclusively attributable to the fact that Rait, her work partner, quit on January 12, 2005, and, of course, Rupert herself quit

16

just a few weeks later. Rait worked alone whenever Rupert, who had a history of work absences, failed to come to work. (Applebee Aff. ¶ 24.)

As to the "cold shoulder" issue, ODC management took prompt steps to address it after plaintiffs complained in early December of 2004. ODC management met separately with plaintiffs and Wesner in an attempt to mollify the effects of their ongoing personality conflict, and also held a department-wide meeting to emphasize that all employees needed to work together, be cordial to one another, and to comply with the rules. Plaintiffs were also advised that management could do little about co-workers' frosty treatment toward them absent some speech or conduct that directly affected plaintiffs' ability to do their jobs, but management encouraged plaintiffs to alert them of any future problems nonetheless. (Zelm letters to plaintiffs; Exs. 8 & 9 to Mot. for Summ. J.) After those meetings and prior to quitting, neither plaintiff complained to ODC management about her work assignments or the allegedly ongoing "cold shoulder" treatment.

**IV. Ellerth/Faragher**

Finally, even if plaintiffs could establish that the conditions to which they were subjected constituted a hostile work environment, ODC would not be liable since it acted promptly pursuant to its written policy against sexual harassment to remedy the problem each time plaintiffs complained. For this reason, and because plaintiff did not suffer a tangible employment action, i.e., demotion or dismissal, ODC is entitled to the protection of the affirmative defense established by the Court in *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998), and *Faragher v. Boca Raton*, 524 U.S. 775, 807-08 (1998). As described by the Court in *Ellerth*,

17

> The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

524 U.S. at 765.

Here, the undisputed evidence shows that ODC had in place a sexual harassment policy that had been disseminated to its employees, including the plaintiffs. (DPFOF ¶ 32.) When plaintiffs first complained to management about the consensual sexual activity between Bidwell and Wesner, both employees were told to discontinue such behavior and warnings were placed in their personnel files. (DPFOF ¶ 21.) Plaintiffs concede, the conduct ceased for a time. Given that the conduct complained of was consensual and not even directed at plaintiffs, it would be hard to argue that ODC's response was unreasonable. In October of 2004, when plaintiffs complained of behavior by Bidwell that actually was directed at them, management promptly investigated the allegations and terminated Bidwell's employment. In addition, King was demoted for his failure to act on his own knowledge of the incidents between Bidwell and Wesner. It is difficult to imagine what further steps ODC could have taken to prevent sexual harassment in its work place. I therefore conclude that even if plaintiffs' evidence were sufficient to allow a jury to find they were subjected to a hostile work environment, ODC would nevertheless be entitled to summary judgment under *Ellerth* and *Faragher*.

18

## CONCLUSION

Plaintiffs have not demonstrated that they suffered under an objectively hostile work environment, and therefore their hostile work environment claims under Title VII fail. As a consequence, their constructive discharge claims fail as a matter of law. Their retaliation claims fail because they have not shown that they suffered any adverse employment action. Finally, even if they could establish a hostile work place, ODC is entitled to summary judgment on the *Ellerth*/*Faragher* defense.

**IT IS THEREFORE ORDERED** that plaintiff's motion for summary judgment is **GRANTED**. Plaintiff's claims are dismissed, with prejudice.

Dated this   1st   day of March, 2007.

           s/ William C. Griesbach
           William C. Griesbach
           United States District Judge